Jimmie Hartfield
October 24, 2017                                                    1

```
 1            UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF MISSISSIPPI
 2                  JACKSON DIVISION

 3

 4   JIMMIE HARTFIELD
                                             PLAINTIFF
 5

 6   VS.           NO. 17-cv-00461-DPJ-FKB

 7

 8   MARRIOTT INTERNATIONAL,
     INC. REGINA LATTIMORE,
 9   INDIVIDUALLY AND AS
     MANAGER/ASSISTANT MANAGER
10   OF MARRIOTT
     INTERNATIONAL, INC. AND
11   JOHN DOES 1-10
                                             DEFENDANTS
12

13

14

15         DEPOSITION OF JIMMIE HARTFIELD

16
       Taken at the instance of the Defendants, at the
17      office of Ottowa E. Carter at 604 Highway 80 W,
     Suite N, Clinton, Mississippi, on Tuesday, October
18             24, 2017, beginning at 9:56 a.m.

19

20

21

22

23
       REPORTED BY:  Robin G. Burwell, CSR #1651
24                   Brooks Court Reporting, Inc.
                     12 Lakeland Circle, Suite A
25                   Jackson, Mississippi 39216
```

EXHIBIT B

U.S. LEGAL SUPPORT
1-800-567-8757

Jimmie Hartfield
October 24, 2017                                                 36

```
 1      A.   Throughout the last -- yes.
 2      Q.   More than three years?
 3      A.   Yes.
 4      Q.   Okay.  So before this accident, at the
 5 time of this accident, and since this accident,
 6 you've had the same insurance company?
 7      A.   Yes.
 8      Q.   All right.  So tell me what you were
 9 doing at the Marriott on the 24th of January 2014?
10      A.   I was attending the State Baptist
11 Convention of Missionary Baptist Association.
12      Q.   So the same thing you were doing up in
13 Cincinnati, just recently, they had it in Jackson?
14      A.   They had the State here in Jackson.
15      Q.   Okay.
16      A.   It was national in Cincinnati.
17      Q.   Got you.  Thank you.
18           So they have that every year, the state?
19      A.   Yes.
20      Q.   Have they ever had it at the Marriott
21 before?
22      A.   Every year.
23      Q.   Were you a registered guest?  Did you
24 have a hotel room?
25      A.   No, I did not.
```

1  the people in that car?
2      A.  I did but I did not -- okay.
3  Clarification.
4      Q.  Sure.
5      A.  When the car stopped, I did not know who
6  was driving the car.  I did not recognize the car.
7  But I knew the car was stopping for me.  However,
8  when I fell, the driver of the car got out of the
9  car and came to where I was.
10     Q.  Okay.
11     A.  I did know her.  She is a member of my
12 church.
13     Q.  All right.
14     A.  I know her.
15     Q.  Okay.  What was her name?
16     A.  Tonja, T-O-N-J-A, Bridgeman.
17     Q.  I think you might have provided her
18 contact information and stuff already.
19     A.  Uh-huh (affirmative response).
20     Q.  All right.  Do you remember the
21 mechanism of your fall?  Do you remember how it
22 happened?
23     A.  I was walking across, I felt something
24 catch my foot and I couldn't -- I just found
25 myself losing balance.  I was walking.  I couldn't

1  pull the foot forward. I couldn't stop, so I fell
2  face down. Because whatever the rod was
3  holding -- I found out it was a rod later -- was
4  holding my foot.
5          So I balanced with my hands and just
6  caught the weight on my hands. I fell forward,
7  lightly scraped my nose. Thank the Lord I did not
8  hit hard on the nose. The weight was on my
9  shoulders and the rest of my body. So I hit it, I
10 hit it hard.
11     Q.   Okay. Was it your right foot or your
12 left foot that got tripped up, do you remember?
13     A.   It was the right foot that got tripped.
14     Q.   Okay. Were you carrying anything at the
15 time?
16     A.   I had some papers in my hand, like a
17 program, and something else they had passed out.
18 Nothing -- and my purse.
19     Q.   A few sheets of paper?
20     A.   A few sheets of paper and my purse,
21 which was light.
22     Q.   Did you have your purse on your shoulder
23 or were you carrying it as well?
24     A.   I had it on my shoulder.
25     Q.   What shoulder was it on, do you

```
 1   remember?
 2       A.   No.
 3       Q.   It's okay.  Do you remember what hand
 4   you were holding the papers in?
 5       A.   Probably right hand, because that's what
 6   I do all the time.
 7       Q.   Immediately after the accident, what
 8   happened?
 9       A.   I lay on the ground hurting.  I remember
10   two ladies over me, one of them was Ms. Bridgeman.
11   The other was a lady from another church whom I
12   had seen on many occasions but did not know who
13   she was.  They were both over me.  I just lay
14   there for a while.  I mean I could not -- there
15   was nothing I could do but just lay there.
16            Then I remember them saying, you know,
17   "Let us help you up."  I, you know -- so I told
18   them -- I remember telling them just let me be for
19   a minute.  And then I was able to crawl over to
20   the wall.  That's how I knew it was a wall.
21            I crawled over to the wall and was able
22   to hold that wall and pull myself up.  I did that
23   and then I -- I told them, I said, "Wow, I
24   stumbled over something."  I said, you know, "I
25   hit something.  Something caught my leg."  And we
```

```
 1   sent them from their cameras to my camera.
 2        Q.   Okay.  So we have pictures, we're just
 3   waiting to get a screen so you can operate the
 4   camera to get the pictures out?
 5        A.   Trying to, yes.
 6        Q.   Okay.  All right.  Do you remember the
 7   condition of the bar and the condition of the road
 8   as you sit here today?
 9        A.   It was, like, concrete and it was, like,
10   worn, brown, rusty and the rod evidently had
11   worked itself out of that concrete and was
12   sticking up.  There was still -- you could see the
13   rod running through the concrete where it was
14   still some in there, but it had worked itself out
15   and was sticking up.
16        Q.   Okay.  You're making an angle with your
17   hand.  Was it sticking up 45 degrees?
18        A.   Like this, I guess (indicating).
19        Q.   How much of the rod was sticking out,
20   just estimate as best you can?  I understand that
21   you don't know.
22        A.   From here like -- about like here,
23   (indicating).
24        Q.   Okay.  And the length of the rod from
25   the tip to the point that it's in the concrete,
```

1  again, can you tell me?
2      A.   Not with accuracy.
3      Q.   What you were just doing just now with
4  your arm off the table, you were trying to
5  estimate the distance that the rod was above the
6  roadway?
7      A.   Right.
8      Q.   At its highest point?
9      A.   Uh-huh (affirmative response).
10     Q.   Do you have an estimate in terms of
11 inches as to how high the tip of that rod was up
12 out of the ground?
13     A.   You know I'm the world's worst person --
14 I'm absolutely the world's worst person with
15 distances.  Maybe six, 12 -- I don't know.  Maybe
16 12, 24 inches, maybe.
17     Q.   You think it was certainly enough for
18 you to get your foot under?
19     A.   I got my foot under, so it had to be
20 enough for me to get my foot under, yes, it caught
21 my foot, yes.  I don't think that, I know it.  I
22 felt it.  I mean -- yes.
23     Q.   All right.  Okay.  So you told me that
24 you lay on the ground hurting immediately after
25 the accident.

Jimmie Hartfield
October 24, 2017                                          84

1   A.   What question are you -- will you
2   explain what you're asking?
3   Q.   Yes.  You're alleging that the bar that
4   you stumbled over was hazardous.
5   A.   Uh-huh (affirmative response).
6   Q.   Why?
7   A.   Because I was walking across a
8   reasonably -- what you would expect to be a
9   reasonably safe place to get to my car.  And I
10  walked across, it caught me, it threw me, I fell,
11  and I feel that that's just a dangerous situation
12  that it should not have happened.
13  Q.   Was it the fact that there was rebar
14  protruding from concrete at all or was it the fact
15  that it was protruding at such a height?
16  A.   That it was protruding enough to catch
17  my foot.
18  Q.   Enough to get your foot up all the way
19  under it?
20  A.   Exactly.
21  Q.   Do you know how long that condition
22  existed?
23  A.   What condition?
24  Q.   The condition that caused your accident?
25  A.   No.  I know that when I looked at it, it